**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| JAMES J. M., | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 19-CV-152-CVE-JFJ |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
|       Defendant. | ) |

**REPORT AND RECOMMENDATION**

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff James J. M. seeks judicial review of the Commissioner of the Social Security Administration's decision finding that he is not disabled. For the reasons explained below, the undersigned **RECOMMENDS** that the Commissioner's decision denying benefits be **AFFIRMED**.

**I.**     **General Legal Standards and Standard of Review**

"Disabled" is defined under the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is an impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A medically determinable impairment must be established by "objective medical evidence," such as medical signs and laboratory findings, from an "acceptable medical source," such as a licensed and certified psychologist or licensed physician;

the plaintiff's own "statement of symptoms, a diagnosis, or a medical opinion is not sufficient to establish the existence of an impairment(s)." 20 C.F.R. §§ 404.1521, 416.921. *See* 20 C.F.R. §§ 404.1502(a), 404.1513(a), 416.902(a), 416.913(a). A plaintiff is disabled under the Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (explaining five steps and burden shifting process). To determine whether a claimant is disabled, the Commissioner inquires: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) considering the Commissioner's assessment of the claimant's residual functioning capacity ("RFC"), whether the impairment prevents the claimant from continuing her past relevant work; and (5) considering assessment of the RFC and other factors, whether the claimant can perform other types of work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v). If a claimant satisfies her burden of proof as to the first four steps, the burden shifts to the Commissioner at step five to establish the claimant can perform other work in the national economy. *Williams*, 844 F.2d at 751. "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." *Id.* at 750.

In reviewing a decision of the Commissioner, a United States District Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the

decision is supported by substantial evidence. *See Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See id.* A court's review is based on the administrative record, and a court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.* A court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if a court might have reached a different conclusion, the Commissioner's decision stands if it is supported by substantial evidence. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

## II.     Procedural History and the ALJ's Decision

Plaintiff, then a 47-year-old male, applied for Title XVI supplemental security income benefits on August 4, 2016, alleging a disability onset date of December 16, 2008. R. 16, 163-168. Plaintiff claimed he was unable to work due to conditions including bipolar disorder, depression, and agoraphobia. *See* R. 178. Plaintiff's claim for benefits was denied initially on November 16, 2016, and on reconsideration on March 24, 2017. R. 61-85. Plaintiff then requested a hearing before an ALJ, and the ALJ conducted the hearing on July 23, 2018. R. 41-60. The ALJ issued a decision on August 21, 2018, denying benefits and finding Plaintiff not disabled because he was able to perform other work existing in the national economy. R. 16-31. The Appeals Council denied review, and Plaintiff appealed. R. 1-3; ECF No. 2.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of August 4, 2016. R. 18. At step two, the ALJ found that Plaintiff had the following severe impairments: schizoaffective disorder-bipolar type; and obesity. R. 19. He

found that Plaintiff's impairments of hypertension and high cholesterol were non-severe, and his impairments of agoraphobia and leg impairment were medically non-determinable. *Id.* At step three, the ALJ found that Plaintiff had no impairment or combination of impairments that was of such severity to result in listing-level impairments. R. 19-21. In assessing Plaintiff's mental impairments under the "paragraph B" criteria, the ALJ found that Plaintiff had moderate limitations in the two areas of (1) understanding, remembering, or applying information and (2) interacting with others; and mild limitations in the two areas of (1) concentrating, persisting, or maintaining pace and (2) adapting or managing oneself. R. 20.

After evaluating the objective and opinion evidence, and Plaintiff's statements, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform a range of medium work as follows:

> The claimant can lift/carry and/or push/pull 50 pounds occasionally and up to 25 pounds frequently. He can sit for at least 6 hours out of an 8-hour workday with normal breaks. The claimant can stand and/or walk for at least 6 hours out of an 8-hour workday with normal breaks. He would be limited to simple repetitive task[s], work with supervisors or coworkers occasionally, and no contact with the public.

R. 21. At step four, the ALJ found that Plaintiff was unable to perform his past relevant work. R. 29. Based on the testimony of a vocational expert ("VE"), however, the ALJ found at step five that Plaintiff could perform other unskilled medium work, such as Hand Packer, Industrial Sweeper Cleaner, and Kitchen Helper. R. 30. The ALJ determined the VE's testimony was consistent with the information contained in the Dictionary of Occupational Titles ("DOT"). *Id.* Based on the VE's testimony, the ALJ concluded these positions existed in significant numbers in the national economy. *Id.* Accordingly, the ALJ concluded Plaintiff was not disabled.

4

**III.    Issues**

Plaintiff raises three points of error in his challenge to the denial of benefits: (1) the ALJ improperly weighed the opinions of treating physician W. John Mallgren, D.O.; (2) the ALJ erred in his assessment of Plaintiff's obesity; and (3) the ALJ failed to perform a proper consistency evaluation. ECF No. 12.

**IV.    Analysis**

**A.    ALJ's Assessment of Dr. Mallgren's Opinions Was Proper**

Plaintiff argues the ALJ improperly assigned "no weight" to a Mental Residual Functional Capacity Assessment ("MRFCA") and a Mental Status Form completed by treating physician Dr. Mallgren. When a medical opinion comes from a treating source, the ALJ must give it controlling weight if it is both "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2); *see Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). If the ALJ finds the opinion is deficient in either respect, then the ALJ must consider several factors in determining the weight to be given to the medical opinion. *See* 20 C.F.R. § 416.927(c). Those factors include: (1) the examining relationship; (2) the treatment relationship; (3) the length of the treatment relationship and the frequency of examinations; (4) the nature and extent of the treatment relationship; (5) how well the opinion is supported; (6) its consistency with other evidence; and (7) whether the opinion is from a specialist. *Id.* If, after considering the relevant factors, the ALJ rejects the opinion completely, "he must then give specific, legitimate reasons for doing so." *Watkins*, 350 F.3d at 1301 (quotations omitted). In all cases, the ALJ must give "good reasons" for the weight assigned to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); *Watkins*, 350 F.3d at 1301.

Dr. Mallgren completed a check-box MRFCA regarding Plaintiff's mental capabilities. R. 396-397. Among other findings, the MRFCA indicated Plaintiff had "marked" limitations in (1) the ability to maintain attention and concentration for extended periods, and (2) the ability to ask simple questions or request assistance. *Id.* Dr. Mallgren also found "extreme" limitations in eight different areas, including (1) ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (2) ability to work in coordination with or proximity to others without being distracted by them; (3) ability to complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) ability to ask simple questions or request assistance; (5) ability to accept instructions and respond appropriately to criticism from supervisors; and (6) ability to respond appropriately to changes in the work setting. *Id.*

Dr. Mallgren also completed a Mental Status Form with narrative notes in July 2018. R. 398-399. Dr. Mallgren noted that Plaintiff was clean/well-groomed and appeared his stated age; looked about the room and often secludes himself; relates poorly to others; was oriented x4; had active hallucinatory activity; had poor concentration, intact memory, and constricted affect; had compromised coping ability with moderate to severe stress; had poor problem-solving skills; stayed at his mother's house and helped her around the house; and visited with his girlfriend. R. 398. Dr. Mallgren recommended continued mental health care, and he opined Plaintiff's prognosis for recovery was guarded. R. 399. He did not expect any significant improvement. *Id.* He further opined that Plaintiff had "good" ability to remember, comprehend, and carry out simple instructions on an independent basis; had "poor" ability to remember, comprehend, and carry out complex instructions on an independent basis; and had "poor" ability to respond appropriately to

6

work pressure, supervision, and co-workers. *Id.* He believed Plaintiff needed a representative payee to assist him in managing his benefits. *Id.* Dr. Mallgren also noted that Plaintiff "has not seen a [doctor] since 6/5/17 at [Grand Lake Mental Health Center] & meds were stopped due to non-compliance," but "active treatment may help." *Id.*

The ALJ stated he was giving "no weight' to Dr. Mallgren's opinions in either his MRFCA or his Mental Status Form. R. 25-26. The ALJ gave five reasons for discounting each of these opinion forms. With respect to the MRFCA, the ALJ explained that (1) it was completed on a "poorly fabricated form that was provided by the representative instead of using a readily available approved SSA form that uses standard forms of measurement instead of attempting to create new measurements (specifically using 'never to minimally' as a form of measurement)"; (2) the date is not legible, which creates problems with connecting it to his treatment notes; (3) the form is just a check form with no explanation to support his opinions; (4) Dr. Mallgren's treatment notes do not support his severe limitations; and (5) Dr. Mallgren's opinion is not consistent with other examinations. R. 25-26. With respect to the Mental Status Form, the ALJ explained that (1) it was completed on a "poorly fabricated form instead of using a readily available approved SSA form"; (2) a portion of the form is illegible and he did not fully complete the form; specifically, Dr. Mallgren did not give a detailed description of daily activities and interests; (3) Dr. Mallgren had not seen Plaintiff for at least a year, and his medications had stopped, meaning the opinion was not based on current examination; (4) Dr. Mallgren's treatment notes did not support his severe limitations; and (5) Dr. Mallgren's opinion is not consistent with other examinations. R. 26.

Plaintiff argues that several of the reasons the ALJ gave for discounting Dr. Mallgren's opinions in the MRFCA and Mental Status Form were improper. First, he argues it was inappropriate for the ALJ to take issue with the forms themselves by noting that they were not

prepared on an approved SSA form. However, the ALJ was entitled to provide less weight to the opinion based on the relevance of the check-box categories to the mental RFC evaluation, particularly where the MRFCA used different mental impairment categories than the SSA form used. *See* SSA Program Operations Manual System ("POMS") DI 24510.060(A)(1) (explaining that, "[b]ecause of the complexity of mental disorder evaluation, a special Form SSA-4734-F4-SUP is to be used to document the mental residual functional capacity (RFC) decision, i.e., what an individual can do despite his/her impairment").

Second, Plaintiff argues the poor legibility of the forms was not a proper reason to discount the opinions. However, Plaintiff himself admits that the date on the MRFCA is difficult to decipher, and the usefulness of the MRFCA findings depends in part on when Dr. Mallgren completed the form. Moreover, the difficulty in reading certain parts of the Mental Status Form is a legitimate reason for discounting it, as the ALJ cannot properly weigh a report he cannot clearly read.

Third, Plaintiff argues the ALJ improperly found Dr. Mallgren's MRFCA and Mental Status Form opinions were inconsistent with his treatment notes and other examination findings. In the decision, the ALJ found Dr. Mallgren's opinions were inconsistent with the following findings from Dr. Mallgren's clinical visits: Dr. Mallgren observed Plaintiff's appearance was adequate, hygiene was fair, fund of knowledge was below average, and attitude was cooperative; his mood was anxious, affect appropriate, insight ambivalent, judgment fair, thought process was normal; his intermediate, short-term, and long-term memory were good; and his attention span and concentration were good. R. 26-27 (citing R. 288-312). *See* R. 304. The ALJ also found Dr. Mallgren's opinions were inconsistent with the following clinical findings from other providers: Plaintiff's appearance was adequate, hygiene fair, fund of knowledge average, attitude was

8

cooperative, mood euthymic, affect appropriate, judgment good, thought process normal, thought content was hallucinations, and memory, attention span, and concentration were good; and consultative examination revealed his thoughts and speech were logical, linear, and goal directed, he responded appropriately to questions related to judgment, abstraction, and insight, his immediate memory was good but he had some difficulty with delayed recall as evidenced by his performance on the Montreal Cognitive Assessment ("MoCA"), his attention and concentration were adequate, and he was able to perform Serial 7s, providing five correct responses. R. 26-27 (citing R. 323-328, 339-392). *See* R. 354.

Plaintiff points to observations of Global Assessment of Functioning ("GAF") scores of 41 and 47 (R. 289, 340); anxious mood (R. 304, 312, 318, 363, 371); below average fund of knowledge and hallucinatory thought content (R. 304); blunted or constricted affect (R. 306, 312, 318, 365, 371, 373, 377, 381, 385, 389, 391, 393); "very anxious" presentation and "somewhat disheveled" appearance (R. 323); sad mood (R. 365, 367, 373, 381, 385, 389); moderate problems related to primary support, school/work problems, problems in living situation, and physical health (R. 340); and severe problems in friendship/social relations, financial difficulties, and unresolved trauma (R. 340). However, this evidence does not overwhelm the substantial evidence the ALJ cited in support of his rejection of Dr. Mallgren's opinions. The ALJ must consider the consistency of other evidence when evaluating a treating physician's opinion. *See* 20 C.F.R. § 416.927(c)(4) (explaining that the more consistent a medical opinion is with the record as a whole, the more weight will be given to that opinion). While some of the ALJ's cited deviations from Dr. Mallgren's opinions were not extreme, some of those deviations were more significant. *Compare* R. 323-328 (October 2016 consultative exam revealed largely normal mental status observations and 30/30 MoCA score) *and* R. 304 (Dr. Mallgren observed normal thought process, good

9

concentration, and good attention span in November 2016) with R. 396 (Dr. Mallgren opined in MRFCA Plaintiff had marked difficulty in ability to maintain attention and concentration for extended periods) *and* R. 398 (Dr. Mallgren opined in Mental Status Form that Plaintiff had poor concentration and poor problem solving skills). The undersigned identifies no error regarding this factor.

The undersigned finds the ALJ provided specific and legitimate reasons for rejecting Dr. Mallgren's MRFCA and Mental Status opinions, in compliance with the regulations and Tenth Circuit law. *See* 20 C.F.R. § 416.927(c); *Watkins*, 350 F.3d at 1301.

### B.   ALJ Properly Considered Plaintiff's Obesity

Plaintiff argues the ALJ committed reversible error by failing to properly assess obesity when determining Plaintiff's RFC. An ALJ must consider the effects of obesity as part of the RFC determination. *See* Social Security Ruling ("SSR") 02-01p, 2000 WL 628049.[1] Obesity can affect "exertional, postural, and social functions," and "[o]besity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment." *Id.* Accordingly, "[a]ssumptions about the severity or functional effects of obesity combined with other impairments [will not be made]," and the ALJ "will evaluate each case based on the information in the case record." *Id.* The obesity consideration may be "subsumed within the discussion of [a claimant's] other medical conditions." *Razo v. Colvin*, 663 F. App'x 710, 716 (10th Cir. Oct. 21, 2016).

Here, the ALJ found obesity was a severe impairment at step two. R. 19. At step three, the ALJ explained that he considered obesity and SSR 02-01p, and that he would be taking obesity

---

[1] SSR 02-01p was rescinded effective May 20, 2019. However, a reviewing court should apply SSR 02-01p if it remained in effect at the time of the ALJ's decision, as was the case here. *See* SSR 19-2p, 2019 WL 2374244, at *5 n.14 (May 20, 2019).

considerations into account in reaching his conclusions at steps two through five of the sequential disability evaluation. *Id.* He further noted at step three that "no treating or examining medical source has specifically attributed additional or cumulative limitations to the claimant'[s] obesity." *Id.* In the RFC discussion, the ALJ noted Plaintiff's body-mass index ("BMI") as observed in the record (BMI 33.3 in April 2017 and 33.18 in June 2017). R. 23-24. He also noted that his care providers observed no visual abnormality in Plaintiff's musculoskeletal system in April 2017 or June 2017. *Id. See* R. 351, 356. In a summary section addressing RFC, the ALJ again noted Plaintiff's BMI of 33, but nonetheless found medium exertion work as outlined in the RFC would be appropriate, "because there are not any medical opinions that the claimant's weight caused any limitations with his ability to carry out basic work activities." R. 28.

Plaintiff argues the ALJ should have expressly considered the effect of Plaintiff's obesity on his other impairments. Specifically, Plaintiff points to obesity's effects on his depression, leg pain, hypertension, and high cholesterol.[2] However, Plaintiff cites to no records in which a medical provider attributed any additional mental or physical functional limitations due to obesity. By contrast, Plaintiff's care providers observed no musculoskeletal abnormalities. R. 351, 356. *See* R. 304 (Dr. Mallgren observed normal strength, normal extremities, and normal heel/toe gait in November 2016), R. 354 (nurse Megan Burnett noted same normal musculoskeletal observations in June 2017), R. 286 (right knee x-ray in June 2015 was normal). The ALJ found Plaintiff's leg impairment was not medically determinable, because the record did not reveal any diagnoses, and the severity of his hypertension and high cholesterol were insufficiently documented in the record. R. 19. At the hearing, Plaintiff testified to suffering from leg aches and pains resulting from

---

[2] Plaintiff also argues the ALJ should have considered obesity combined with asthma, sleep apnea, fibromyalgia, and osteoarthritis of the back, hips, knees, and hands. ECF No. 12 at 7-8 (citing R. 22). However, it does not appear Plaintiff suffered from these conditions, and Plaintiff's citation to the record is not apt. Accordingly, the undersigned will not further consider these conditions.

11

childhood injuries and a car accident, but neither he nor his counsel raised any concerns related to obesity. R. 54-55. Plaintiff's complaints of depression are noted throughout the record, but there is no indication that his depression related to his obesity in any way, and Plaintiff points to no specific records supporting this allegation. Accordingly, Plaintiff's argument fails.

The undersigned finds the ALJ's discussion of obesity was proper and sufficient. The ALJ clearly acknowledged and addressed Plaintiff's obesity at steps two and three, and in discussing the RFC, but nonetheless found Plaintiff could perform a range of medium work. The diagnosis of obesity does not necessarily translate into functional limitations. *See Johnson v. Comm'r, SSA*, 764 F. App'x 754, 758 (10th Cir. 2019) (noting that SSR 02-01p "does not mandate any additional restrictions or a finding of disability" based on a claimant's obesity). Plaintiff points to no conflict or lack of development in the record regarding obesity. He also has not pointed to any medical evidence indicating his obesity resulted in functional limitations greater than those stated in the RFC. *See Rose v. Colvin*, 634 F. App'x 632, 637 (10th Cir. 2015) (finding no error in obesity evaluation where ALJ found obesity severe and included specific postural limitations consistent with record but did not specifically mention obesity in RFC determination).

### C.     ALJ's Consistency Analysis Was Supported by Substantial Evidence

Plaintiff argues the ALJ's consistency analysis was improper. In evaluating a claimant's symptoms, the ALJ must determine whether the claimant's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record. SSR 16-3p, 2016 WL 1119029, at *7. If they are consistent, then the ALJ "will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities." *Id.* If they are inconsistent, then the ALJ "will determine that the individual's symptoms are less likely to reduce his or her capacities to perform

work-related activities." *Id.* Factors the ALJ should consider in determining whether a claimant's pain is in fact disabling include the claimant's attempts to find relief and willingness to try any treatment prescribed; a claimant's regular contact with a doctor; the possibility that psychological disorders combine with physical problems; the claimant's daily activities; and the dosage, effectiveness, and side effects of the claimant's medication. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012); *see also* SSR 16-3p at *7 (listing similar factors); 20 C.F.R. § 416.929(c)(3).[3]

Consistency findings are "peculiarly the province of the finder of fact," and courts should "not upset such determinations when supported by substantial evidence." *Cowan v. Astrue*, 552 F.3d 1182, 1190 (10th Cir. 2008) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)). As long as the ALJ sets forth the specific evidence he relies on in evaluating the consistency of the claimant's subjective complaints with other evidence, the ALJ "need not make a formalistic factor-by-factor recitation of the evidence." *Keyes-Zachary*, 695 F.3d at 1167 (quotations omitted). "[C]ommon sense, not technical perfection, is [the reviewing court's] guide." *Id*.

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical and other evidence in the record. R. 26. The ALJ explained that "[t]he dichotomy between the claimant's allegations and the evidence of record as a whole reflects poorly due to inconsistencies in the record." *Id.* In particular, he noted that Plaintiff worked only sporadically prior to the

---

[3] This evaluation, previously termed the "credibility" analysis, is now termed the "consistency" analysis. *See* SSR 16-3p (superseding SSR 96-7p). In practice, there is little substantive difference between a "consistency" and "credibility" analysis. *See Brownrigg v. Berryhill*, 688 F. App'x 542, 545-46 (10th Cir. 2017) (finding that SSR 16-3p was consistent with prior approach taken by Tenth Circuit). Therefore, Tenth Circuit decisions regarding credibility analyses remain persuasive authority.

alleged disability onset date, raising a question as to whether his continuing unemployment was due to medical impairments. R. 26-27. He further noted that Plaintiff's allegations regarding (1) receiving mental health medication and treatment, (2) not wanting to be around other people, (3) problems with sleeping, and (4) the frequency and severity of his hallucinations were inconsistent with the record. R. 27. He also noted that Plaintiff reported he had shoplifted in order to obtain a Valentine's Day gift for his girlfriend, indicating he was "willing to participate in activities for secondary gains." R. 27 (citing R. 367).

Plaintiff alleges the ALJ erred in this analysis, by failing to specify which of Plaintiff's complaints were not believable or consistent; by overstating Plaintiff's limited activities of daily living; by misrepresenting the record regarding Plaintiff's mental health treatment history; and by improperly faulting Plaintiff's non-compliance with medications. ECF No. 12 at 8-14. Plaintiff does not dispute that he had a sporadic work history prior to the alleged onset date, that he was willing to participate in activities for secondary gains by shoplifting, or that his statements were inconsistent with the record regarding not wanting to be around people, problems with sleeping, and frequency of his hallucinations.

First, Plaintiff alleges that the ALJ did not specify which complaints were inconsistent with the record. However, the ALJ did in fact specify which complaints were inconsistent with the record, citing to specific allegations and portions of the record that were inconsistent. R. 26-27. Plaintiff himself goes on to take issue with these specific record citations, which defeats his own argument.

Second, regarding his daily activities, Plaintiff complains that his ability to spend time with his girlfriend, help her mow her large yard, help his mother with chores, spend time with his son and grandson, and do some painting for money does not mean he could perform substantial gainful

14

activity for eight hours a day, five days a week. However, it is proper for the ALJ to consider Plaintiff's activities in evaluating his complaints. *See* SSR 16-3p, at *7 (stating that ALJ should consider claimant's daily activities as part of consistency analysis). The ALJ accurately listed Plaintiff's activities as he reported to his care providers. The ALJ was not required to find a direct correlation between his activities and the demands of substantial gainful activity.

Third, Plaintiff argues the ALJ impermissibly mischaracterized the evidence by stating that Dr. Mallgren noted Plaintiff had not been seen by a doctor at Grand Lake Mental Health since June 5, 2017. R. 27 (citing R. 399). Plaintiff points out that he was seen by mental health providers at that facility regularly between June 2017 and April 2018. *See* R. 365-385. However, these records do not demonstrate the ALJ misrepresented the record. Rather, the ALJ accurately cited Dr. Mallgren's notation, and Plaintiff's cited records do not contradict that notation. Plaintiff saw a mental health counselor after June 2017, but the cited records do not show that Plaintiff saw a *doctor* after that date. Moreover, the ALJ was clearly aware of those later counseling records, because he summarized them in another section of the decision. *See* R. 24-25 (citing R. 339-392). The undersigned identifies no error.

Finally, regarding Plaintiff's non-compliance with medication, Plaintiff contends the ALJ should have investigated as to the reason for his alleged non-compliance. The ALJ noted that Plaintiff's allegations that he was on mental health medication when released from prison (R. 315) and participated in mental health treatment while incarcerated (R. 324) were inconsistent with Department of Corrections records indicating he did not receive any mental health treatment or medications for mental issues for nearly two years, and with notes from Grand Lake Mental Health in 2016 indicating Plaintiff had been off his medication since 2012 (R. 264-287, 298). R. 27. The ALJ also pointed to Dr. Mallgren's note in his Mental Status Form that Plaintiff had not seen a

doctor at Grand Lake Mental Health since June 2017, and that his medications were stopped due to non-compliance. R. 27 (citing R. 399).

Plaintiff suggests, without support, that his mental health condition made it difficult for him to exercise appropriate judgment regarding his treatment. However, Plaintiff was capable of taking medication for his mental health issues, and he recognized that his mental state improved when he was consistently taking his medication. *See, e.g.*, R. 298 (Plaintiff stated in November 2016 that "meds taken last worked well," even though he had been off meds since 2012), R. 377 (Plaintiff shared in June 2017 that recently his mood had "considerably improved," as he was consistently taking his meds and seeing his ex-wife), R. 383 (Plaintiff related in June 2017 that he was feeling less depressed and believed his medications had "finally started working again"), R. 375 (Plaintiff stated in September 2017 that he was "feeling better than I have in years," as he was taking his medications, making all his appointments, and interacting with positive individuals). In addition, even if the ALJ failed to adequately address the reason for Plaintiff's non-compliance with medication, the ALJ provided other valid reasons for finding Plaintiff's statements inconsistent with the record, some of which Plaintiff does not challenge. As a result, the ALJ's analysis remains, on balance, proper and supported by substantial evidence. *See, e.g., Pickup v. Colvin*, 606 F. App'x 430, 433-34 (10th Cir. 2015) (affirming ALJ's credibility determination despite finding two of the reasons given by ALJ were not supported by substantial evidence).

The undersigned finds that the ALJ's consistency analysis was proper. Plaintiff's consistency arguments are unavailing, and the ALJ's discussion of Plaintiff's subjective complaints and the objective evidence satisfies SSR 16-3p.

## RECOMMENDATION

The undersigned **RECOMMENDS** that the Commissioner's decision be **AFFIRMED.**

## OBJECTION

In accordance with 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by August 14, 2020.

If specific written objections are timely filed, Federal Rule of Civil Procedure 72(b)(3) directs the district judge to

> determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

*Id.*; *see also* 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of both factual and legal questions." *United States v. One Parcel of Real Property*, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

**SUBMITTED** this 31st day of July, 2020.

*/s/ Jodi F. Jayne*
**JODI F. JAYNE, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**